## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JONATHAN D. ROSEN,

                  **Plaintiff,**

    v.

PROTECTIVE LIFE INSURANCE
COMPANY, AMERICAN
GUARANTEE AND LIABILITY
INSURANCE COMPANY, ZURICH
AMERICAN INSURANCE
COMPANY, and INSURANCE
SPECIALTIES SERVICES, INC.,

                  **Defendants.**

                        1:09-cv-3620-WSD

## OPINION AND ORDER

This matter is before the Court on Defendant Zurich American Insurance

Company and Defendant American Guarantee and Liability Insurance Company's

(collectively, "Zurich") Motion for Summary Judgment [172], Plaintiff Jonathan

D. Rosen's ("Rosen") Motion for Partial Summary Judgment [176], Zurich's

Motion for an Oral Hearing on its Motion for Summary Judgment [175], Zurich's

Motion and Amended Motion for Leave to File a Surreply [214, 215], Rosen's

Motion to Exclude Testimony of Stephen Darr [169], and Rosen's Motion to

Exclude Testimony of Marshall Reavis, III, Ph.D. [170].

## I.      BACKGROUND

This lawsuit arises from a Settlement and Release Agreement (the "Settlement Agreement") that resolved an earlier lawsuit between Rosen and his former insurer, Zurich.  The Settlement Agreement provides that "the terms of this Release and the terms of the settlement of this claim shall not be used to the detriment of the parties, shall remain confidential, and shall not be disclosed to any person not a party or privy to this settlement except as may be required by law." Rosen asserts a scattershot of claims against Zurich including that Zurich breached the Settlement Agreement by disclosing the terms of the Agreement and by using the Settlement Agreement terms to his detriment.  Rosen further claims that Zurich fraudulently induced him to enter into the Settlement Agreement, fraudulently sold him insurance for which he was ineligible, and fraudulently overstated the insurance losses it incurred that were attributable to claims against Rosen.  Finally, Rosen claims that Zurich's underwriting of Rosen's insurance coverage was part of a criminal racketeering enterprise.

### A.      The Protective Errors & Omissions Insurance Program

During the periods relevant to this lawsuit, Rosen was the CEO and chairman of Entaire Global Companies, Inc. ("Entaire"), as well as a board member for several Entaire subsidiaries.  (Rosen I Dep. 10:2-12:10).  Entaire

provides retirement programs to business professionals and executives.  (Id.).

Rosen was also the principal of Wealth Builders Foundation for Economic

Planning ("Wealth Builders"), a corporation that provides personal financial

consulting services.  (Id.).

In 2001, Rosen entered into an agency contract with Protective Life

Insurance Company ("Protective Life Insurance"),[1] which permitted Rosen to sell

Protective Life Insurance's insurance products.  (Defs.' Statement of Undisputed

Material Facts ("DSMF") [172-2] ¶ 1; Pl.'s Resp. Defs.' Statement of Undisputed

Material Facts ("RDSMF") [189-1] ¶ 1).  Rosen also had insurance agency

contracts with other insurance companies, which authorized him to sell those

companies' insurance policies.  (Am. Compl. ¶ 49).  The agency contracts with

Protective Life Insurance and the other companies required Rosen to carry Errors

and Omissions Insurance ("E&O Insurance").  (Id. ¶¶ 48-49).

Between 2002 and 2008, Rosen purchased E&O Insurance through a

program that Protective Life Insurance sponsored for its agents (the "Protective

E&O Program" or "Program").  (DSMF ¶¶ 2, 35; RDSMF ¶ 2).  The Protective

---

[1] Protective Life Insurance was a defendant in this action, but was dismissed
pursuant to the Court's Order dated May 20, 2011.

E&O Program was administered by Insurance Specialties Services, Inc. ("ISSI"),[2] and underwritten by Zurich.  (DSMF ¶ 3; RDSMF ¶ 3).  ISSI was responsible for enrolling agents, collecting premiums, and issuing certificates of insurance for the Program.  (Smith I Dep. 43:9-:22).  ISSI annually would bill agents for the premiums for their E&O coverage, hold the payments in a fiduciary account until the premium payment deadline, and then remit the payments, minus a commission, to Zurich.  (DSMF ¶¶ 31, 37; RDSMF ¶¶ 31, 37).

When participants joined the Program, ISSI issued a certificate of insurance that Zurich had approved, but it was not ISSI's practice to send the actual insurance policy.  (Pl.'s Statement Undisputed Material Facts ("PSMF") [176-2] ¶¶ 9-11; Defs.' Resp. Pl.'s Statement Undisputed Material Facts ("RPSMF") [188-1] ¶ 10).  Agents were eligible for coverage under the Protective E&O Program only if they maintained an active agency contract with Protective Life Insurance. (DSMF ¶ 32; RDSMF ¶ 32).  In the certificates of insurance issued for policy years 2002-2003 through 2006-2007, "Covered Agents" were defined as "Producers with a current contract with Protective Life."  (Smith I Dep. 312:1-:15 & Ex. 14).  The program further provided that "Full coverage ceases on the date agent contract with the sponsor is terminated or agent retires.  There is no premium refund.

---

[2] ISSI was a defendant in this action, but was voluntarily dismissed by Rosen on November 16, 2010.

Agent will be able to report claims for one year after the date of termination."

(Id.).  The certificate of insurance issued to Rosen for the policy period February

2007 to February 2008 did not contain language indicating that coverage ceased

upon termination of the agency contract with Protective Life Insurance.

(Certificate of Insurance, Pl.'s Resp. Summ. J. Ex. A).

     B.    <u>The Griffin Lawsuit</u>

In July 2006, Loretta Griffin sued Rosen and several others, alleging that she

was damaged by a financial product she purchased through Entaire (the "Griffin

Action").  (DSMF ¶ 4; RDSMF ¶ 4).  Zurich, under a reservation of rights,

provided indemnity and defense for Rosen and the other defendants under the

Protective E&O Program and similar programs, and allowed Rosen to select a law

firm to represent him individually.  (DSMF ¶ 5; RDSMF ¶ 5).  Zurich did not,

however, timely pay Rosen's defense firm, which Rosen alleges caused his defense

counsel to cease providing defense services and to threaten to withdraw as Rosen's

counsel.  (DSMF ¶ 7; RDSMF ¶ 7; Pl.'s Resp. Mot. Summ. J. 12).  The Griffin

Action settled in August 2007, with Zurich paying $202,000 in indemnity on

Rosen's behalf.  (DSMF ¶ 6; RDSMF ¶ 6).

C.   Rosen's Bad Faith Lawsuit Against Zurich

In June 2007, before the Griffin Action settled, Rosen, another defendant in the Griffin Action, and two Entaire entities that were also Griffin defendants filed a lawsuit against Zurich in Georgia state court, alleging that Zurich's failure to timely pay defense legal fees in the Griffin Action was done in bad faith (the "Bad Faith Action").  (Pl.'s Resp. Mot. Summ. J. Ex. X).  Zurich failed to answer Rosen's complaint in the Bad Faith Action and was found by the trial court to be in default.  (Rule Nisi and Notice of Bench Trial on Plaintiffs' Damages, Pl.'s Resp. Mot. Summ. J. Ex. M).  A bench trial on the issue of damages was scheduled for March 25, 2008.  (Id.).

On December 13, 2007, Rosen, Rosen's counsel, Entaire's corporate counsel, and Zurich's counsel met to discuss settling the Bad Faith Action. (DSMF ¶ 12; RDSMF ¶ 12).  According to declarations from Rosen, Rosen's counsel, and Entaire's corporate counsel, Rosen stated at the meeting that he would only settle the Bad Faith Action if Zurich agreed not to use any facts relating to the Griffin Action or Bad Faith Action to Rosen's detriment.  (Rosen Aff. ¶ 19; Veith Aff. ¶ 6; Bahr Aff. ¶ 22).

On December 21, 2007, Zurich's counsel sent the following email to Rosen's counsel:

> I got your voice message and we have a deal for $350,000 with the other mutual terms we discussed. I will do a more formal letter confirming next week and will get to you a draft of the closing papers (settlement agreement and release, dismissal, withdrawal of the default and consent to open, etc) as soon as possible."

(Email from Brad Marsh, Dec. 21, 2007, 6:01 PM, Pl.'s Resp. Mot. Summ. J. Ex. N).

On January 9, 2008, Zurich provided a draft written agreement to Rosen's counsel. (DSMF ¶ 14; RDSMF ¶ 14). Rosen's counsel added language to the agreement making the release bilateral, requiring that the terms of the release and settlement be kept confidential, and prohibiting either party from using the terms to the detriment of the other party. (DSMF ¶ 15; RDSMF ¶ 15).

On January 21, 2008, Zurich approved the modified draft agreement, which contained the confidentiality and no-detriment provisions added by Rosen's counsel, and the Bad Faith Action was settled for $350,000. (DSMF ¶ 17). The agreement, titled "SETTLEMENT AND RELEASE AGREEMENT," states in relevant part:

> [T]he parties hereby declare, represent and warrant . . . [t]hat no promise or inducement or agreement not herein expressed has been made by the Parties and that this Release contains the entire agreement between the Parties, and that the terms of this agreement are contractual and not a mere recital.
>
> . . .

IT IS FURTHER UNDERSTOOD AND AGREED that the terms of this Release and terms of the settlement of this claim shall not be used to the detriment of the Parties, shall remain confidential, and shall not be disclosed to any person not a party or privy to this settlement except as may be required by law. . . .

In entering into this Release, Parties represent that they have read all the terms hereof and understand and voluntarily accept all the terms hereof, and that they have been adequately represented and advised by their own legal counsel.

This Release shall be construed and interpreted in accordance with the laws of the State of Georgia.

(Settlement Agreement, Pl.'s Resp. Mot. Summ. J. Ex. O).

The parties dispute the effective date of the Settlement Agreement.

(RDSMF ¶ 17).  Rosen contends the Settlement Agreement memorialized the "deal for $350,000 with the other mutual terms" that Zurich accepted on December 21, 2007.  (Id.).  Zurich argues that on December 21, 2007, the parties only agreed to the settlement amount, that Rosen's counsel added the confidentiality and no-detriment provisions to the draft agreement during later negotiations, and that Zurich did not agree to those additional provisions until it accepted the finalized agreement on January 21, 2008.  (Defs.' Mot. Summ. J. 14-15).

D.    Rosen's Termination From Protective Life Insurance

On October 2, 2007, representatives from Protective Life Insurance, ISSI, and Zurich met to discuss the premium for the Protective E&O Program for the

February 2008 to February 2009 period.  (DSMF ¶ 20; RDSMF ¶ 20).  At the meeting, Zurich presented a "loss run," which reflects all the losses incurred by the Program over a particular period (the "October 2007 Loss Run").  (DSMF ¶ 21; RDSMF ¶ 21).  The October 2007 Loss Run included approximately $900,000 in defense and indemnity costs that Zurich attributed to Rosen for the Griffin Action.  (Smith I Dep. 322:6-:18).  None of the attendees of the meeting recall discussing Rosen or the Griffin Action during the October meeting, and Zurich indicated at that time that the premiums for the February 2008 to February 2009 period would not substantially change.  (DSMF ¶ 21; RDSMF ¶ 21; see also Smith I Dep. 321:20-322:4).

On Friday, December 21, 2007, Timothy Rasool ("Rasool") of Zurich informed the head of ISSI, Kenneth Smith ("Smith"), that the Protective E&O Program faced potentially large premium increases for the February 2008 to February 2009 term.  (DSMF ¶ 24; RDSMF ¶ 24).  In late December 2007 or early January 2008, Zurich indicated that the premium increase could be as high as 40%.  (Smith IV Dep. 139:21-140:14).  Zurich attributed the rate increase to unusually large claims for three agents, one of whom was Rosen, although Rosen's losses had not significantly changed since the October 2007 meeting.  (Smith I Dep. 320:18-323:20).  When Rasool first informed Smith of the pending premium

9

increase, he also asked Smith to question Protective Life Insurance about whether Rosen was an important agent.  (Smith IV Dep. 158:20-160:8).  Sometime in December, Zurich provided another loss run (the "December 2007 Loss Run") to Protective Life Insurance.  (DSMF ¶ 22; RDSMF ¶ 22).

Smith told Paul Eder ("Eder") of Protective Life Insurance about the proposed premium increase and relayed Zurich's inquiry about the importance of Rosen to Protective Life Insurance's business.  (Smith IV Dep. 162:12-163:11). As a result of the proposed premium increases and the inquiry about Rosen, Protective Life Insurance examined Rosen's past performance and found that he had not produced any business for Protective Life Insurance in the past six years. (DSMF ¶ 26; RDSMF ¶ 26).  On January 4, 2008, Eder informed Smith of ISSI that Protective Life Insurance was terminating Rosen's contract.  (DSMF ¶ 29).

The open enrollment period for the Protective E&O Program's February 2008 to February 2009 term began, approximately, in January 2008.  (DSMF ¶ 30; RDSMF ¶ 30).  On February 26, 2008, ISSI sent Plaintiff a second renewal notice for the Program, in which only contracted agents of Protective Life Insurance could participate.  (DSMF ¶¶ 30, 32; RDSMF ¶ 30, 32).  On February 27, 2008, Protective Life Insurance mailed a letter to Rosen terminating Rosen's agency contract.  (DSMF ¶ 33; RDSMF ¶ 33).  The letter stated that the termination was

effective February 8, 2008.  (DSMF ¶ 34).  According to the terms of Rosen's

agency contract with Protective Life Insurance, the termination of the contract was

effective only upon mailing of the termination notice.  (Id.).  Zurich asserts that

Rosen was eligible to renew his coverage under the Protective E&O Program when

ISSI sent the renewal notice on February 26, 2007, because Protective Life

Insurance did not effectively terminate Rosen until it mailed the termination notice

on February 27, 2007.  (Id.).[3]

Rosen completed and returned the Protective E&O Program renewal notice,

and ISSI processed Rosen's premium payment on March 4, 2008.  (DSMF ¶ 36;

RDSMF ¶ 36).  After Rosen received his termination notice from Protective Life

Insurance, he contacted ISSI and on March 26, 2008, Rosen received a refund of

the premium payment he made.  (DSMF ¶¶ 38-39; RDSMF ¶¶ 38-39).  Rosen

contends that ISSI was on notice that Protective Life Insurance had terminated

Rosen's agency contract, and that ISSI knew that its renewal notice falsely stated

that Rosen would receive insurance coverage in exchange for his premium

payment.  (RDSMF ¶ 39).  Rosen claims that because ISSI mailed the renewal

notice and processed Rosen's premium payment, Zurich committed civil fraud and

---

[3] Rosen claims that Zurich has not consistently held this position about the
effective date of Rosen's termination.  (RDSMF ¶ 34)

the crimes of theft by deception, mail fraud, and wire fraud, and that those crimes were in furtherance of a pattern of criminal racketeering activity.

      E.      <u>Rosen's Attempts To Procure Alternative E&O Insurance</u>

After Rosen was terminated by Protective Life Insurance and no longer eligible for the Protective E&O Program, he sought alternative E&O Insurance through a similar program sponsored by Old Mutual (the "Old Mutual E&O Program"), and underwritten by Zurich.  (DSMF ¶¶ 40-41; RDSMF ¶¶ 40-41).  On March 27, 2008, Zurich denied Rosen's application for coverage under the Old Mutual E&O Program.  (DSMF ¶ 42; RDSMF ¶ 42).  Zurich cited several reasons for its decision to decline coverage, but a significant factor was that Rosen had sued Zurich for bad faith.  (DSMF ¶¶ 43-44).  Rasool stated at the time that, "[i]n light of the fact that we had problems with Mr. Rosen while he was enrolled in the Protective Life Agents' E&O Program, we are not inclined to permit him to enroll in the [Old Mutual E&O Program]."  (Email from Rasool dated Mar. 19, 2008, 3:16 PM, Pl.'s Resp. Mot. Summ. J. Ex. U ).  Rasool also testified that an individual's past bad faith suit against Zurich would be a consideration in the decision whether to insure that individual, and that Zurich "tend[s] to shy away from people who appear to be litigious."  (Rasool Dep. 118:1-119:4).

After Zurich declined his application, Rosen searched for alternative E&O Insurance coverage in April and May 2008.  (DSMF ¶¶ 45, 47; RDSMF ¶¶ 45, 47). Because he could not obtain coverage personally as he had under the Protective E&O Program, Rosen sought coverage for Wealth Builders, of which he was the principal and primary shareholder.  (RDSMF ¶¶ 46).  As part of this application process, Rosen asked ISSI to provide him with his loss run from the Protective E&O Program.  (DSMF ¶ 49; RDSMF ¶ 49).  ISSI in turn requested the loss run from Zurich.  (DSMF ¶ 49; RDSMF ¶ 49).

On May 1, 2008, Zurich generated a new loss run (the "May 2008 Loss Run").  (DSMF ¶ 49).  Rosen argues he did not seek a new loss run, only a copy of the loss run that Zurich had created in December 2007.  (RDSMF ¶ 49).  The May 2008 Loss Run included the defense and indemnity costs of the Griffin Action, the $350,000 to settle the Bad Faith Action, and additional attorneys' fees incurred by Zurich in defending the Bad Faith Action.  (DSMF ¶ 50; RDSMF ¶ 50).  It is unusual and inaccurate to include the costs of a bad faith lawsuit in an E&O Insurance loss run because the bad faith costs are not incurred as part of the coverage responsibilities under the insurance policy.  (Smith IV Dep. 151:3-:14; Rasool Dep. 101:7-:20).  Zurich contends that the inclusion of the settlement

amount from the Bad Faith Action in the May 2008 Loss Run resulted from a coding error.  (Koller II Dep. 89:13-:23).

After giving the May 2008 Loss Run to prospective insurers, Rosen later obtained E&O Insurance coverage from a company called XL, at a rate significantly higher than he had previously paid.  (DSMF ¶ 52; RDSMF ¶¶ 52, 54). Rosen told the XL representative that a portion of the costs associated with the May 2008 Loss Run was the result of the settlement of the Bad Faith Action against Zurich.  (DSMF ¶ 53; RDSMF ¶ 53).  Rosen asked the XL representative whether his insurance rate would have been less if the May 2008 Loss Run had been smaller, and the representative respond that it "would be slightly different but not by a lot."  (DSMF ¶ 54; RDSMF ¶ 54).

F.   Allegations Of Criminal Activity And Racketeering

Rosen claims that Zurich's actions constituted criminal conduct. Specifically, Rosen claims that when Zurich induced Rosen to sign the Settlement Agreement, it committed theft, by deception, of his bad faith cause of action. Rosen further claims that Zurich committed theft by deception, mail fraud, and wire fraud when ISSI incorrectly billed Rosen for the February 2008 to February 2009 coverage period.  Rosen alleges that these are not isolated criminal acts, but part of a pattern of criminal racketeering activity.  In support of the racketeering

allegations, Rosen alleges that Zurich and ISSI, with the assistance of Protective

Life Insurance, have engaged in a practice of selling illusory insurance coverage.

Rosen asserts that Zurich and ISSI have committed numerous instances of theft by

taking, theft by deception, mail fraud, and wire fraud, by failing to partially refund

premiums to former Protective Life Insurance agents who became ineligible for the

Protective E&O Program during a coverage period, and by renewing former

Protective Life Insurance agents who were not eligible for insurance coverage.

In January 2009, Protective Life Insurance performed an audit to determine

whether any of the participants in the Protective E&O Program failed to qualify as

Protective Life Insurance agents and thus were ineligible for the Program.  (PSMF

¶ 21; RPSMF ¶ 21).  This initial audit suggested that for the February 2008 to

February 2009 policy period, 383 individuals who were ineligible for coverage had

paid premiums to participate in the Program.  (PSMF ¶ 22; RPSMF ¶ 22).  In

response, ISSI mailed letters to those agents informing them that they were not

eligible to renew for the February 2009 to February 2010 policy period.  (PSMF ¶

22; RPSMF ¶ 22).  Rosen claims the letter falsely stated that those agents had

coverage through the remainder of the coverage period, when their coverage had

actually ended upon the termination of their contract with Protective Life

Insurance.  (PSMF ¶ 23).  Rosen alleges that Zurich continues to retain premium

payments made by agents for insurance coverage for which they were not eligible, which, according to Rosen, is a criminal act.  (PSMF ¶ 28).

Zurich argues that further investigation has revealed that the number of ineligible but enrolled agents was greatly overstated by Protective Life Insurance's January 2009 audit.  (Defs.' Statement Additional Material Facts [188-4] ¶¶ 1-2). The original audit simply identified agents associated with terminated agency contracts, but Zurich states this was inaccurate because an agent may hold multiple contracts with Protective Life Insurance or related entities, and termination of one contract does not make the agent ineligible for the Protective E&O Program if other contracts are still active.  (Id. ¶¶ 3-4).  According to Zurich, further investigation has revealed that the actual number of ineligible agents enrolled in the Program is much smaller than the 2009 audit suggested, although Zurich does not quantify the number of ineligible agents that were enrolled in the program.  (Id. ¶ 5).  Rosen responds that at least some agents have paid for insurance coverage for which they were not eligible, and that Zurich continues to knowingly retain premiums for agents who were ineligible to renew or who became ineligible before

a policy period ended, which Rosen contends is theft by taking.  (See Reply Pl.'s

Mot. Summ. J. [212] at 7-11).[4]

      G.    Procedural Background

On November 23, 2009, Rosen commenced this lawsuit against Zurich,

ISSI, and Protective Life Insurance in the Superior Court of Gwinnett County,

Georgia.  On December 23, 2009, the defendants removed the case to this Court.

On January 4, 2010, Rosen filed his Amended Complaint, asserting ten counts: (1)

Fraud in the inducement to enter into the Settlement Agreement; (2) Fraud in the

inducement to renew Rosen's 2008-2009 enrollment in the Protective E&O

Program; (3) Fraud in the creation and distribution of the May 2008 Loss Run that

included costs associated with the Griffin Action and Bad Faith Action; (4)

Violations of Georgia's RICO Act; (5) Conspiracy to violate Georgia's RICO Act;

(6) Breach of the Settlement Agreement; (7) Negligent administration of the

Protective E&O Life Insurance Program; (8) Negligence per se; (9) Attorneys' fees

under O.C.G.A. § 13-6-11; and (10) Punitive damages.

On May 20, 2010, the Court granted Protective Life Insurance's Motion to

Dismiss.  On November 16, 2010, the parties stipulated to dismiss ISSI from the

---

[4] There is no evidence that Zurich has denied a claim, would deny a claim, or intended to deny a claim for any agent who paid premiums but was technically ineligible to participate in the Protective E&O Program.

case and to dismiss the negligence and negligence per se claims against Zurich. The remaining counts against Zurich are pending, and Zurich has moved for summary judgment on the remaining counts. Rosen has moved for partial summary judgment on the pattern element of his Georgia RICO Act claim. Rosen has also moved to strike the testimony of two of Zurich's expert witnesses. Because the motions to strike are not related to evidence under consideration in the motions for summary judgment, the Court first considers the motions for summary judgment.

## II.   MOTIONS FOR SUMMARY JUDGMENT

Zurich moves for summary judgment on all of Rosen's remaining claims. Rosen moves for partial summary judgment on the "pattern of racketeering activity" element of his Georgia RICO Act claim.

### A.   Legal Standard On A Motion For Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "*to the extent supportable by the record*."  Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)) (emphasis in original).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a

19

rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

 B. Breach Of The Settlement Agreement

Rosen claims Zurich breached the Settlement Agreement by using the existence of the Griffin Action and Bad Faith Action to his detriment in December 2007 in connection with determining the premiums for the Protective E&O Program, by denying his enrollment into the Old Mutual E&O Program in March 2008 as a result of the Bad Faith Action, and by incorporating into the May 2008 Loss Run the amount for which the Bad Faith Action settled.  Zurich requests summary judgment on each of Rosen's breach of contract claims.

  1. *Interpretation Of The Settlement Agreement*

The parties dispute the proper interpretation of the Settlement Agreement's confidentiality and "no-detriment" provisions, and they dispute when those provisions became effective.  Rosen argues that the Settlement Agreement prohibited disclosing and using to either party's detriment the terms of the Settlement Agreement and the existence of and the facts underlying the Griffin Action and Bad Faith Action.  Rosen argues that these contractual terms became effective when Zurich accepted the settlement offer on December 21, 2007, and

thus the nondisclosure and no detrimental use provisions were enforceable after December 21, 2007.

Zurich claims that the Settlement Agreement only bars the disclosure and detrimental use of the terms of the Settlement Agreement, not the existence and facts of the underlying lawsuits. Zurich further argues that on December 21, 2007, it only agreed to the settlement amount, and that it did not agree to the disclosure and no-detriment provisions until Rosen's counsel added them to the draft agreement in January 2008.

### a.  Georgia Principles Of Contract Interpretation

The construction of a contract is a question of law for the court. Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co., 707 S.E.2d 369, 371 (Ga. 2011) (quoting RLI Ins. Co. v. Highlands on Ponce, 635 S.E.2d 168, 171 (Ga. Ct. App. 2006)). A court must first determine whether the contractual language is clear and unambiguous. Id. (quoting RLI Ins. Co., 635 S.E.2d at 171). "Ambiguity exists where the words used in the contract leave the intent of the parties in question," that is, the parties' intent "is uncertain, unclear or is open to various interpretations." Gen. Steel, Inc. v. Delta Bldg. Sys., Inc., 676 S.E.2d 451, 453 (quoting Capital Color Printing v. Ahern, 661 S.E.2d 578, 583 (2008)). "Conversely, no ambiguity exists where, examining the contract as a whole and

affording the words used therein their plain and ordinary meaning, the contract is capable of only one reasonable interpretation." Id. at 453-54 (quoting Ahern, 661 S.E.2d at 583).

If the language of the contract is unambiguous, "the court simply enforces the contract according to the terms, and looks to the contract alone for the meaning." Am. Empire Surplus Lines Ins. Co., 707 S.E.2d at 371 (quoting RLI Ins. Co., 635 S.E.2d at 171). "Unambiguous language must be afforded its literal meaning and plain ordinary words given their usual significance." Perkins v. M&M Office Holdings, LLC, 695 S.E.2d 82, 84 (Ga. Ct. App. 2010). Extrinsic parol evidence as to the surrounding circumstances may only be used to aid in the construction of ambiguous language, and "is not admissible to contradict or construe an unambiguous contract." Coleman v. Arrington Auto Sales & Rentals, 669 S.E.2d 414, 416 (Ga. Ct. App. 2008).

b. Application

The parties dispute the meaning of the phrase, "the terms of this Release and the terms of the settlement of this claim." The information indicated by that phrase must remain confidential and may not be used by either party to the detriment of the other party. Zurich argues that the two uses of "term" refer plainly and unambiguously to the terms of the Settlement Agreement. Rosen contends that

only "terms of this Release" refers to the Settlement Agreement and that the phrase "terms of the settlement of this claim" is ambiguous and refers to extra-contractual, oral agreements made by the parties pursuant to the Settlement Agreement. Rosen further argues that the Settlement Agreement does not contain a merger clause, and that the contract should therefore be interpreted with the aid of affidavits from Rosen, Rosen's attorney, and Entaire's attorney, which state the affiants' beliefs that the word "term" referred to the facts and existence of the Griffin Action and Bad Faith Action. The Court disagrees.

Rosen's argument that the Settlement Agreement does not contain a merger clause is belied by the language of the Settlement Agreement itself. The Settlement Agreement provides that "no promise or inducement or agreement not herein expressed has been made by the Parties and that this Release contains the entire agreement between the Parties."[5] (Settlement Agreement 3). This directly contradicts that the Settlement Agreement incorporates prior, unmentioned oral agreements not contained within the Agreement.

---

[5] Rosen apparently believes that because some agreements state that "all prior agreements and understandings are merged into this agreement," or words to that effect that are not present here, that the agreement is not an integrated agreement between the parties. Rosen's interpretation would violate the clear, unambiguous statement that the Release contains the "entire agreement between the parties." That is, Rosen seeks to create ambiguity where none exists.

23

The language "terms of this Release and terms of the settlement of this claim" also is unambiguous.  The word "term" refers to "provisions that determine the nature and scope of an agreement."  Merriam-Webster's Collegiate Dictionary 1289 (11th ed. 2003) (third definition); see also Black's Law Dictionary (9th ed. 2009) (defining "term" as "[a] contractual stipulation").  Construing the language based in its "plain, ordinary, and popular sense," Nesbitt v. Wilde, 703 S.E.2d 389, 391 (Ga. Ct. App. 2010), the language "the terms of this Release and the terms of the settlement of this claim" unambiguously refers to the contractual provisions relating the scope and nature of the Settlement Agreement, which are contained in the Agreement itself.

The terms are plain and straightforward.  In return for a payment by Zurich of $350,000 to Entaire Global Companies, Inc., Entaire Global Financial, Inc., Rosen and William R. Muirhead (collectively called the "Releasors"), the Releasors agreed to release Zurich from any claims or other consequences arising from the "incident(s) underlying or giving rise" to the Griffin Action or the Bad Faith Action.  As Rosen agreed: "Releasors have previously presented [Zurich] with a claim for damages arising out of the [Griffin Action and Bad Faith Action] and it is the intent of Releasors to release [Zurich] from any and all claims, damages, loss, whether known or unknown, made or which would have been

made, which are directly or indirectly related to the [Griffin Action or Bad Faith Action] . . . or the incidents underlying or giving rise to the lawsuits." (Settlement Agreement 1). The terms of the Settlement Agreement then were the agreed exchange of money to resolve the two cases described or claims relating to them and the agreed exchange of releases.

Rosen argues that the phrases "terms of this Release" and "terms of the settlement of this claim" must, to avoid redundancy, have different meanings and that "terms of the settlement of this claim" necessarily refers to the broader conditions under which the parties settled their dispute. Leaving aside the existence of the merger provision and the plain, unambiguous meaning of the language, Rosen's argument is illogical. The contract at issue is titled "Settlement and Release Agreement." The Settlement Agreement serves two essential functions: to state the terms to settle the existing Bad Faith Action and to "release and forever discharge" both parties from all "consequences of the incident(s) underlying or giving rise" to the two lawsuits identified in the Settlement Agreement and any consequences arising from the lawsuits. The language is therefore only reasonably understood as broadly referring to the nature and scope of the agreement to settle the identified lawsuits and the agreement to release all other possible claims related to the identified lawsuits. Pursuant to the

unambiguous language of the Settlement Agreement and the terms of the merger clause, both of those individual agreements exist entirely and exclusively within the written Settlement Agreement.[6]

The Court finds based on the terms of the Settlement Agreement that the agreement is not ambiguous and further finds, as a matter of law, that the Settlement Agreement only restricts the disclosure and detrimental use of the contractual terms of the Settlement Agreement.  The Settlement Agreement does not prohibit the disclosure or detrimental use of the underlying facts or existence of the Griffin Action and Bad Faith Action.  This is the only sensible interpretation of the Settlement Agreement, especially since the lawsuits and the facts and claims asserted in them are a matter of public record.  If Rosen wanted to prohibit use or disclosure of the facts upon which the lawsuits were based, he could have requested language to that effect be included in the Settlement Agreement.[7]

---

[6] That is the only logical interpretation of the agreement.  For example, if Rosen's interpretation were accepted, if Rosen sought insurance underwritten by Zurich, Zurich would not be allowed to consider Rosen's claim history in underwriting the policy requested, including the risk Rosen presented as an insured, and, if a policy was written, the premium to be charged to address this risk presented.  What the confidentiality provision prohibits here relates to the compromise reached; not the underlying conduct that led to the compromise.

[7] The Court notes that the confidentiality and no-detriment language was crafted by Rosen, not Zurich, and if ambiguous should be construed against Rosen as the drafter.  Dep't of Cmty. Health v. Pruitt Corp., 673 S.E.2d 36, 39 (Ga. Ct. App. 2009).

2.      *Alleged December 2007 Breach Of The Settlement Agreement*

It is against this legal backdrop that the Court considers the specific breach of contract instances alleged by Rosen.  Rosen first claims that in December 2007, Zurich engaged in conduct that breached the Settlement Agreement's prohibition on either party acting to the other party's detriment.  Rosen specifically alleges that Zurich indicated to Protective Life Insurance that Zurich intended to significantly raise the premiums for the Protective E&O Program and that Zurich directed ISSI to ask Protective Life Insurance whether Rosen was an important agent.  This conduct was impermissibly detrimental, Rosen argues, because it caused Protective Life Insurance to terminate Rosen's agency contract in order to secure a smaller premium increase.

Zurich argues it could not have breached the Settlement Agreement because the allegedly improper conduct occurred before it agreed to the no-detriment provision.  Because Zurich and Rosen agreed to settle the Bad Faith Action on December 21, 2007, but did not formally agree on the terms in the Settlement Agreement until January 21, 2008, they dispute the effective date of the confidentiality and no-detriment provisions.  Zurich argues that on December 21, 2007, it only agreed to the settlement figure, and that it negotiated and agreed upon the confidentiality and no-detriment provisions in January 2008.  (DSMF ¶¶ 12-

14).  On December 21, 2007, however, Zurich's counsel stated that "we have a deal for $350,000 with the other mutual terms we discussed."  (Email from Brad Marsh, Dec. 21, 2007, 6:01 PM, Pl.'s Resp. Mot. Summ. J. Ex. N).

There is no evidence that Zurich breached the Settlement Agreement by causing Rosen's termination.  Rosen only argues that Zurich caused Protective Life Insurance to terminate his agency contract based on the losses incurred in the Griffin Action and the existence of the Bad Faith Action.  This does not create an issue of fact, because the alleged conduct, if true, did not constitute a breach of the Settlement Agreement.[8]  Rosen interprets the Settlement Agreement as prohibiting Zurich from using the fact that Rosen's conduct gave rise to an E&O claim under the Protective E&O Program, that the claim resulted in a loss and that the Bad Faith Action had been filed by Rosen.  These are not terms of the Settlement Agreement and, importantly, these are facts that are publicly disclosed in the litigation identified, by court and case number, in the Settlement Agreement.  The Court finds, as a matter of law, that Zurich did not breach the Settlement Agreement by disclosing underlying facts that were disclosed in the lawsuits settled or by the fact that litigation was instituted by Rosen.

---

[8] The Court also finds that the Settlement Agreement merger clause precludes Rosen's argument that the parties agreed on December 21, 2007, to a confidentiality and no-detriment provision broader than the one agreed to in the Settlement Agreement.

The only arguable way Zurich could have breached the Settlement Agreement during the premium negotiations would have been if Zurich based the proposed premium increase on the Bad Faith Action settlement amount—a term of the Settlement Agreement.  There is, however, no evidence that the amount was disclosed or used to Rosen's detriment.  The negotiations between Zurich and Protective Life Insurance were based on the December 2007 Loss Run, which showed increased losses compared to the October 2007 Loss Run.  (Smith I Dep. 322:19-323:10).  The December 2007 Loss Run revealed that the Protective E&O Insurance Program's losses largely resulted from three substantial claims, of which the Griffin Action was only one and it was not the largest and had not significantly changed from October to December 2007.  (Id. at 323:4-:10).  The parties agree that the December 2007 Loss Run did not contain the settlement amount of the Bad Faith Action.  (DSMF ¶ 23; RDSMF ¶ 23; Smith I Dep. 333:16-336:23).  The Court determines that the loss run did not contain any information subject to the confidentiality and no-detriment provision in the agreement reached between the parties.

There simply is no evidence to support that Rosen's termination was based in any way on Zurich's use or disclosure of a term of the Settlement Agreement. Disclosure of facts underlying the publicly filed Griffin or Bad Faith Actions was

not a disclosure of the terms of the Settlement Agreement and this did not breach the Settlement Agreement terms.  There is no disputed issue of material fact related to Rosen's claim that Zurich breached the contract with respect to Protective Life Insurance's termination of Rosen's agency contract, and the Court grants summary judgment in Zurich's favor on this claimed disclosure.

        *3.*    *Alleged March 2008 Breach Of The Settlement Agreement*

Rosen next claims that Zurich breached the Settlement Agreement in March 2008, when Zurich refused to allow Rosen to enroll in the Old Mutual E&O Program.  The parties do not dispute that the existence of the Bad Faith Action played some role in Zurich's decision to deny Rosen's Old Mutual E&O application.  Zurich admits that its decision to decline Rosen's application for the Old Mutual Program was based in part on "the existence of the [Bad Faith] Action brought by Plaintiff."  (DSMF ¶ 43).  At the time Zurich denied Rosen's application, Rasool from Zurich also stated that the decision was made "[i]n light of the fact that we had problems with Mr. Rosen while he was enrolled in the Protective Life Agents' E&O Program."  (Email from Rasool dated Mar. 19, 2008, 3:16 PM, Pl.'s Resp. Mot. Summ. J. Ex. U).

The Settlement Agreement, however, only bars Zurich from using the terms of the Settlement Agreement to Rosen's detriment, not from taking into account

the existence of the Bad Faith Action when making future coverage decisions. Rosen has not submitted any evidence showing that Zurich relied on, or in any way used, any term from the Settlement Agreement when it denied Rosen's Old Mutual E&O Program application.  Rosen argues only that Zurich relied on the existence of the Bad Faith Action.  Consideration of the fact that Rosen filed the Bad Faith Action to determine whether to extend E&O coverage to Rosen in the Old Mutual Program does not, as a matter of law, breach the terms of the Settlement Agreement and Zurich is entitled to summary judgment based on Rosen's claim that Zurich breached the Settlement Agreement in March 2008, by denying coverage to Rosen.[9]

### 4.    Alleged May 2008 Breach Of The Settlement Agreement

Rosen's next breach of contract claim arises out of the May 2008 Loss Run that Zurich provided to Rosen and that Rosen provided to potential replacement E&O insurance carriers.  The parties agree that Zurich included, in the May 2008 Loss Run, the costs of settling and defending the Bad Faith Action.  (DSMF ¶¶ 50-

---

[9] Rosen seeks to cobble together an argument that the Settlement Agreement nondisclosure provision prohibited Zurich from considering Rosen's claim history—information that was known to Zurich before it entered into the Settlement Agreement.  Claims history information is ordinarily and customarily used in the industry to make underwriting assessments.  The Settlement Agreement did not preclude Zurich from using publicly available claims history information to underwrite its coverages.  It only prohibited disclosure and use of the terms the parties reached in the Settlement Agreement to settle the claims asserted by Rosen.

51; RDSMF ¶¶ 50-51).  Doing so involved using the settlement amount of the Bad

Faith Action—a term of the Settlement Agreement—in a way that was detrimental

to Rosen, because it substantially raised the reported cost of the claims against

Rosen when he was in the Protective E&O Program, in turn possibly increasing the

cost of Rosen's replacement E&O Insurance.  Zurich does not argue it is entitled to

summary judgment because a breach did not occur.  Rather, Zurich argues that any

damages for this alleged breach are too speculative as a matter of law and thus

summary judgment on this breach of contract claim should be granted.

Damages for a breach of contract are those that naturally and usually arise

from the breach and which the parties contemplated would occur.  Ga. Code Ann.

§ 13-6-2.  "The rule against the recovery of vague, speculative, or uncertain

damages relates more especially to the uncertainty as to cause, rather than

uncertainty as to the measure or extent of the damages. Mere difficulty at fixing

their exact amount, where proximately flowing from the alleged injury, does not

constitute a legal obstacle in the way of their allowance."  Bollea v. World

Championship Wrestling, Inc., 610 S.E.2d 92, 98-99 (Ga. Ct. App. 2005); see also

Carolina Cas. Ins. Co. v. R.L. Brown & Assocs., Inc., No. 1:04-cv-3537-GET,

2006 WL 2842733, at *14-15 (N.D. Ga. 2006) (same); Ayers v. John B. Daniel

Co., 133 S.E. 878, 878 (Ga. Ct. App. 1926).

Zurich claims that Rosen cannot prove damages because the representative of XL, from which Rosen ultimately received replacement E&O Insurance, could not say with certainty how much higher Rosen's insurance rates were as a result of the May 2008 Loss Run, which included the cost to settle the Bad Faith Action. Asked by Rosen if a smaller Loss Run would improve Rosen's rates, XL's representative stated, "not by a heck of a lot, really.  I mean they would be slightly different but not by a lot."  (DSMF ¶ 54).  XL's representative said many factors impacted the cost of XL's alternative coverage.  (DSMF ¶ 55; RDSMF ¶ 55).

The evidence cited by Zurich supports that the damages arising from Zurich's alleged breach of the Settlement Agreement were not substantial, and that they will be difficult to measure.  The question here, however, is not whether the damages are difficult to measure, only whether they reasonably and naturally resulted from the alleged breach.  Rosen allegedly sustained damage when Zurich wrongfully used the settlement amount to inflate the reported insurance losses attributable to covering Rosen, which allegedly caused Rosen to pay a higher insurance premium.  An increased cost of insurance is the type of harm that reasonably and proximately results from the wrongful disclosure of the settlement terms of a lawsuit involving the same type of insurance.  Zurich has not provided evidence that determining the amount of damages would be impossible, rather than

merely difficult.  Zurich's motion for summary judgment on the breach of contract claim relating to the May 2008 Loss Run must be denied.

C.    Fraud In The Inducement To Enter The Settlement Agreement

Zurich moves for summary judgment on Rosen's claims that Zurich fraudulently induced Rosen to enter into the Settlement Agreement.  To assert a claim for fraud under Georgia law, Rosen "must show (i) a false representation or omission of a material fact; (ii) scienter; (iii) intention to induce the party claiming fraud to act or refrain from acting; (iv) justifiable reliance; and (v) damages." TechBios, Inc. v. Champagne, 688 S.E.2d 378, 380 (Ga. Ct. App. 2009).

> In most circumstances, actionable fraud cannot be predicated on a promise contained in a contract because fraud generally cannot be predicated on statements that are in the nature of promises as to future events, and to hold otherwise, any breach of a contract would amount to fraud.  However, an exception to this rule exists where a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place.

Id. at 380-81 (citations and internal quotation marks omitted).

"Fraudulent intent at the time of contracting can be inferred based on subsequent conduct of the defendant that is unusual, suspicious, or inconsistent with what would be expected from a contracting party who had been acting in good faith."  JTH Tax, Inc. v. Flowers, 691 S.E.2d 637, 642 (Ga. Ct. App. 2010) (quoting BTL COM Ltd. v. Vachon, 628 S.E.2d 690, 696 (Ga. Ct. App. 2006)).

"Fraud may be proved by slight circumstances, and whether a misrepresentation is fraudulent and intended to deceive is generally a jury question." Id. (quoting BTL COM, 628 S.E.2d at 696).

A finding of recklessness may also satisfy the intent element of fraud. "A fraudulent or reckless representation of facts as true when they are not, if intended to deceive, is equivalent to a knowledge of their falsehood even if the party making the representation does not know that such facts are false." Ga. Code Ann. § 51-6-2(a); see also Smiley v. S & J Investments, Inc., 580 S.E.2d 283, 289 (Ga. Ct. App. 2003) ("to recklessly represent facts as true to deceive, when it is not known whether or not such facts are true, is fraud as a matter of law"). "[T]here must be some evidence," however, "from which a jury could find that a misrepresentation . . . was recklessly made with the intent of deceiving the opposite party." Perimeter Realty v. GAPI, Inc., 533 S.E.2d 136, 147 (Ga. Ct. App. 2000).

Rosen contends that "Zurich, at a minimum, recklessly represented that it would not act to Rosen's detriment." (Pl.'s Resp. Mot. Summ. J. 31).[10] Rosen's

---

[10] Rosen seems to argue that Zurich may have recklessly misrepresented its own intent to perform under the Settlement Agreement. It is not clear what it means to recklessly represent one's own present intent without knowledge of whether that intent exists. See Smith v. Orthalliance, No. 1:01-cv-2778-BBM, 2004 WL 5512959, at *4 n.6 (N.D. Ga.) (questioning whether recklessness standard applies to fraud involving alleged misrepresentations regarding future events). Intent, by its nature, is either known or not known by the party making the promise. Because

fraudulent inducement claim is based on Rosen's view that the Settlement

Agreement prohibited Zurich from engaging in any conduct that caused detriment

to Rosen.  To support his fraudulent inducement claim, Rosen relies particularly on

his allegation that Zurich breached the Agreement in December 2007 and January

2008 by causing Protective Life Insurance to terminate Rosen's agency contract,

an action Rosen notes was taken near the time that Zurich negotiated and executed

the Settlement Agreement.  Rosen also relies on his claim that Zurich breached the

Agreement by denying his application to join the Old Mutual E&O Program, and

by including the Bad Faith Action settlement amount in the May 2008 Loss Run, to

support his argument that Zurich's conduct was evidence that Zurich did not intend

to abide by its promise in the Settlement Agreement not to use the Settlement

Agreement terms to Rosen's detriment.

To show that Zurich entered into the Settlement Agreement without a

present intent to perform, Rosen points to conduct by Zurich that Rosen contends

is inconsistent with an intent to refrain from using the facts and existence of the

Griffin Action and Bad Faith Action to Rosen's detriment.  But for the reasons

---

the Court concludes, however, that Rosen has not submitted evidence that is
sufficient to create an issue of fact that Zurich made a false representation—that is,
that Zurich promised to perform the obligations of the Settlement Agreement
without a present intent to do so—it is not necessary to resolve the question of how
one makes a reckless representation about one's own intent.

discussed previously in this Order, Rosen's interpretation of the terms of the Settlement Agreement is not factually, or legally, persuasive.  Zurich did not fraudulently misrepresent its agreed performances under the Settlement Agreement.

Under the plain terms of the Settlement Agreement, Zurich only potentially breached the Settlement Agreement when, without disclosing the amount of the Settlement Agreement, Zurich used the settlement amount to compute Rosen's total losses for the May 2008 Loss Run.  This breach, without more, does not create an issue of fact whether Zurich fraudulently misrepresented its intentions to perform under the Settlement Agreement at the time it entered into the Agreement. The isolated breach of the contract occurred approximately five months after Zurich entered into the Agreement and only after Rosen requested that Zurich provide him with a loss run.[11]  The undisputed evidence is that inclusion of the settlement amount in the loss run Rosen requested was the result of a coding error. (Koller II Dep. 89:13-:23).  Thus, there is not any evidence that Zurich lacked intent to perform its obligations under the Settlement Agreement when it entered into the Agreement, and there is not any evidence that the single potential breach of the Agreement even was intentional.

---

[11] Rosen argues that what he wanted to receive was a copy of the 2007 loss run but there is no evidence that he specified a loss run as of a specific date.

Rosen points to two more bits of evidence to support his claim that Zurich did not intend to fulfill the Settlement Agreement when Zurich entered into it. First, he claims that the Zurich representative who approved and signed the Settlement Agreement directed that the Agreement be placed in Zurich's files, rather than taking affirmative steps to ensure that other Zurich employees complied with the Agreement.  This is not conduct that is "unusual, suspicious, or inconsistent with what would be expected from a contracting party who has been acting in good faith," JTH Tax, 691 S.E.2d at 642.  Maintaining the Settlement Agreement in a secure place is an appropriate and reasonable way to ensure that its terms are kept confidential.  Although the unusual confluence of Rosen's request for his loss run and Zurich's coding error caused the settlement amount to be used in a manner adverse to Rosen's interests, this is not unusual or suspicious conduct, it is not sufficient to create an issue of fact on Zurich's intent to perform under the Settlement Agreement, and a reasonable jury would not find evidence that Zurich intended fraudulently to induce Rosen to enter into the Settlement Agreement.

Rosen next relies on alleged breaches of a Consent Order that he entered into with Zurich in July 2008.  (Pl.'s Resp. Mot. Summ. J. Ex. Y ("Consent Order")). The Consent Order enjoined Zurich "from any further dissemination of the [May 2008] Loss Run," enjoined both parties from "casting any slanderous and

defamatory aspersions about the other party," and required Zurich to take "all reasonable efforts to retract the Loss Run previously transmitted to any and all third parties." (Consent Order 2). Rosen argues that Zurich breached the Consent Order by failing to remove information about the Griffin Action and Bad Faith Action from Zurich's internal loss run records, and by failing to send a request to ISSI to return or destroy the May 2008 Loss Run. The obligations in the Consent Order are different and broader than those in the Settlement Agreement. Even if Zurich breached the Consent Order, which contained different obligations and was allegedly breached in different ways than those alleged here, such purported breach is not evidence that Zurich lacked intent in December 2007 or January 2008 to perform its obligations under the Settlement Agreement.

Fraudulent intent may be shown by "slight circumstances," JTH Tax, 691 S.E.2d at 696, but "there must be some evidence from which a jury could find that a misrepresentation was known to be false at the time made or that it was recklessly made with the intent of deceiving the opposite party." Perimeter Realty, 533 S.E.2d at 147. Zurich's conduct after agreeing to the Settlement Agreement is not unusual or suspicious conduct that is sufficient to create an inference that Zurich entered into the Agreement without a present intent to perform. The alleged May and July 2008 conduct also is too remote and attenuated from the

circumstances of Zurich entering into the Settlement Agreement in December 2007 and January 2008 to create an issue of fact about Zurich's intent in December 2007 and January 2008.  Summary judgment is required to be granted in Zurich's favor on Rosen's claim that Zurich fraudulently induced him to enter into the Settlement Agreement.

D.    Fraud In The Inducement To Renew Enrollment In The E&O Program

Zurich moves for summary judgment on Rosen's claim that ISSI fraudulently induced Rosen to renew his enrollment in the Protective E&O Program for the February 2008 to February 2009 policy period.  Rosen specifically claims that ISSI mailed an invoice on February 26, 2008, which told Rosen to "Please pay promptly to avoid a lapse in coverage."  (Invoice, Pl.'s Resp. Mot. Summ. J. Ex. R).  Rosen contends this statement was fraudulently made because it stated that if Rosen paid his premium, he would receive E&O Insurance coverage and would not have a lapse in coverage.  Rosen's position is the statement was fraudulent because the person making it knew Rosen was not eligible for coverage because Protective Life Insurance had terminated his agency contract effective February 8, 2008.  While Rosen acknowledges that the statement was made by an ISSI employee, he charges that Zurich is liable for it because even though ISSI is a company separate from Zurich, ISSI is Zurich's agent and under an agency theory

40

of liability, Zurich is liable for ISSI's allegedly false representation.  Zurich

contends that Rosen has not shown that ISSI's statement was knowingly false or

that Rosen suffered any damages from it.

### 1.  *Knowingly False Statement With Intent To Deceive*

Fraud may be based on a statement that is known to be false and made to

deceive or on a statement recklessly representing a fact as true and made to

deceive.  Smiley, 580 S.E.2d at 289.

### a.  Knowingly False Representation

It is undisputed that ISSI did not have actual knowledge that Rosen was

ineligible for coverage.  Eder of Protective Life Insurance told Smith of ISSI that

Protective was "terminating" Rosen, but this supports only that Protective Life

Insurance intended to end Rosen's agency contract.  It does not indicate the

contract had been terminated or when it would be terminated.  (See Eder II Dep.

95:16-:22; Email from Smith dated Jan. 4, 2008, 12:55 PM, Pl.'s Resp. Mot.

Summ. J. Ex. P).  The evidence shows that in March 2008—two months after Eder

mentioned Rosen's termination and after ISSI solicited and processed Rosen's

renewal—Smith and Eder were both unsure of Rosen's status with Protective Life

Insurance.  Smith asked in March 2008 whether Rosen had been terminated and, if

so, when the termination occurred.  (Email from Smith dated Mar. 17, 2008, 9:04

41

AM, Smith I Dep. Ex. 3).  Eder replied that he had "discussed [Rosen's]

termination for lack of production a few months [ago]" and that another Protective

Life Insurance employee was to handle the matter.  (Email from Eder dated Mar.

17, 2008, 8:00 PM, Smith I Dep. Ex. 3).  Eder did not know a termination notice

had been sent to Rosen.  (Id.).  Based on this evidence, no reasonable jury could

conclude that ISSI had actual knowledge that its statement that Rosen would

receive coverage in exchange for his premium payment was false.

> b.    Reckless Representation

Rosen alternatively asserts that if ISSI did not know that Rosen had actually

been terminated, it was reckless in representing that Rosen would receive coverage

in exchange for his premium.  (Pl.'s Resp. Mot. Summ. J. 31).  The theory is that

when ISSI learned that Rosen would be terminated by Protective Life Insurance,

ISSI incurred the obligation to remove Rosen from its renewal and billing process.

(See id. at 16-17).  By not preemptively treating Rosen as a terminated agent, the

argument goes, ISSI recklessly stated that Rosen would be eligible for coverage for

which he might not have been eligible.[12]

This argument is hollow.  It ignores that the single comment made to ISSI

that Protective Life Insurance was terminating Rosen did not communicate any

---

[12] The parties dispute to this day whether the statement was actually false.
(Compare DSMF ¶ 34 with RDSMF ¶ 34).

information about when termination might occur.  Without any way of knowing

when Protective Life Insurance would act to terminate Rosen's contract, ISSI

could not predict whether it would take days, weeks, or months.  Had ISSI refused

to extend coverage to Rosen before receiving confirmation whether Rosen's

contract had been terminated, it could have exposed itself to additional liability by

denying Rosen the opportunity to obtain coverage to which he was entitled.  It is

also significant that Rosen was one of thousands of agents in the Protective E&O

Program.  A single suggestion by ISSI's contact at Protective Life Insurance—who

himself was unsure in March 2008 whether Rosen's contract had been

terminated—that Protective Life Insurance was terminating Rosen, is not sufficient

to show that when ISSI mailed the final invoice notice on February 26, 2008, it

harbored any doubt it was invoicing for insurance to which Rosen was not entitled.

More fundamentally, Rosen has taken an unreasonable position about what

the Invoice actually says.  The Invoice's statement that Rosen should pay his

premium promptly to avoid a lapse in coverage is a statement only about how to

properly comply with ISSI's billing requirements, and to avoid making an

untimely payment which could jeopardize his participation in the Protective E&O

Program.  Rosen has, as he has in this litigation as a whole, taken an aggressive,

but unsupported, litigating position that the Invoice made far-reaching promises

about Rosen's participation in the Protective E&O Program. This litigation posturing strains credibility. What ISSI sent is simply a form billing invoice. Most people understand an invoice's purpose and the scope of its representations. It is doubtful that Rosen drew the exaggerated conclusions he argues now from the Invoice at the time he received it. Even if he did, which the Court finds doubtful, that is not sufficient to convert ISSI's arguable billing error into a fraudulent misrepresentation made with conscious and knowing disregard about the truth of the representation.

2.   *Damages*

Rosen has also failed to present any evidence that the alleged misrepresentation caused him any damage. Damages are an essential element of a claim for fraud. TechBios, 688 S.E.2d at 380. Rosen has only shown that a charge was temporarily placed on his credit card on March 4, 2008, and then refunded about twenty-two days later—on March 26, 2008. Rosen has not offered any evidence or argument showing how this temporary and brief charge to his credit card damaged him.[13]

---

[13] At most, Rosen argues that he had a potential gap in coverage depending on the effective date of Protective Life Insurance's termination of his agency contract, (Pl.'s Resp. Mot. Summ. J. 17 n.87). That supposition is unrelated to any statement contained in the Invoice about which Rosen complains.

To the extent Rosen complains of conduct by ISSI, Rosen seeks to hold Zurich liable under an agency theory.  (Pl.'s Resp. Mot. Summ. J. 31).  Assuming ISSI was an agent of Zurich, there is nothing to suggest that ISSI had actual authority to enroll ineligible agents in the Protective E&O Program.  There also is not any evidence that Zurich ratified ISSI's unauthorized act to bill Rosen: ISSI never even transmitted Rosen's premium payment to Zurich, (Smith Aff. dated Jan. 12, 2011, ¶ 6), and there is no evidence that Zurich even knew the invoice was sent.  It certainly did not accept or retain the premium fully knowing all the material facts.  Ellis v. Fuller, 638 S.E.2d 433, 436 (Ga. Ct. App. 2006).

One could suppose that Rosen intended to claim that Zurich is vicariously liable for ISSI's conduct in sending the premium notice on the theory that ISSI had apparent authority to enroll ineligible agents into the Protective E&O Program.  See, e.g., Capital Color Printing, Inc. v. Ahern, 661 S.E.2d 578, 586-87 (Ga. Ct. App. 2008) (applying doctrine of apparent agency).  The supposition is illogical.  The consequence of ISSI's apparent agency would be to bind Zurich to contracts that ISSI executed on Zurich's behalf.  In that was the case, Rosen received coverage for a short time for which he was ineligible and for which he ultimately

did not pay any premium.[14]  This constituted, if anything, an act by ISSI to bind Zurich to a contract without authorization.  There simply is no evidence that binding Zurich to provide coverage for Rosen to which he was not entitled damaged Rosen in any way.[15]

There is no question of fact whether ISSI made a false statement of fact that was knowingly or recklessly false, or whether Rosen was damaged by any alleged misrepresentation.  Summary judgment is required to be granted in Zurich's favor on Rosen's claim that he was fraudulently induced to renew his enrollment in the Protective E&O Program.

E.    Fraud From The May 2008 Loss Run

Zurich next moves for summary judgment on Rosen's claim that Zurich's inaccurate inclusion in the May 2008 Loss Run of the costs of the Bad Faith Action constituted fraud.  To survive summary judgment, there must be some evidence that creates a question of fact whether Rosen justifiably relied on the May 2008 Loss Run.  TechBios, 688 S.E.2d at 380.  Rosen does not allege in his Amended Complaint that he relied on the May 2008 Loss Run; he only alleges that

[14] The Court does not address whether Zurich was bound to provide coverage to Rosen for that period, only that such might be the consequence of Rosen's theory of vicarious agency liability.

[15] The case would be different if ISSI misrepresented the nature and scope of the insurance coverage.  If Rosen had detrimentally relied on such a misrepresentation he may have been able to assert that he incurred damages.

unspecified "others" may have relied on it.  (Am. Compl. ¶ 250).  That is not sufficient to state a claim for fraud.  Rosen does not point to any evidence that would allow a reasonable jury to conclude that Rosen relied on the May 2008 Loss Run.  Zurich's motion for summary judgment on Rosen's claim that he was defrauded by the May 2008 Loss Run is required to be granted.

F.     Georgia RICO Act and Conspiracy Claims

Under Georgia's Racketeer Influenced and Corrupt Organizations Act, it is "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money."  Ga. Code Ann. § 16-14-4(a).  A "pattern of racketeering activity" means "at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions" that are interrelated.  Id. § 16-14-3(8)(A).  A "racketeering activity" is the commission, attempt, solicitation of another, or coercing of another to commit a "crime which is chargeable by indictment" under one of forty categories of offenses.  Id. § 16-14-3(9)(A)(i)-(xl).

To have standing to bring a civil claim under Georgia's RICO Act, a plaintiff must not only show a pattern of racketeering activity, but also "a direct nexus between at least one of the predicate acts listed under the RICO Act and the

injury [the plaintiff] purportedly sustained." Schoenbaum Ltd. Co. v. Lenox Pines, LLC, 585 S.E.2d 643, 655 (Ga. Ct. App. 2003) (internal quotation marks omitted). "To establish this nexus, the plaintiff must show that one of the predicate acts directly harmed it, not a third party." Id. To make this showing, Rosen relies on the same conduct underlying his fraud claims.

Rosen alleges that Zurich entered into the Settlement Agreement without a present intent to honor its obligations under the Agreement, that Zurich distributed loss runs that incorrectly included the costs of the Griffin Action and Bad Faith Action, and that ISSI fraudulently induced Rosen to attempt to renew his enrollment in the Protective E&O Program. This conduct, according to Rosen, constituted the crimes of theft by taking, Ga. Code Ann. § 16-8-2, theft by deception, id. § 16-8-3, and mail and wire fraud, 18 U.S.C. §§ 1341, 1343, which are predicate crimes under Georgia's RICO Act that allegedly injured Rosen.

The crimes Rosen accuses Zurich of committing require specific intent to wrongfully deprive another of property. See Brown v. State, 692 S.E.2d 9, 11 (Ga. Ct. App. 2010) (for theft by taking, "[t]he evidence must show that the requisite intent to deprive the owner of the property was present at the time of the taking." (internal quotation marks omitted)); Avery v. Chrysler Motors Corp., 448 S.E.2d 737, 739 (Ga. Ct. App. 1994) (unlike civil fraud, theft by deception "requires that

48

the person committing the crime *does* know or believe that the created impression (which itself must have been intentionally created or confirmed) is false"); United States v. Kreimer, 609 F.2d 126, 128 (5th Cir. 1980) (mail fraud statute requires proof "not only that there was fraudulent activity but also that the defendant had a conscious knowing intent to defraud" (internal quotation marks omitted)).[16]

The element of intent necessary to support a finding that Zurich committed any of these crimes is at least as rigorous if not more rigorous than the intent necessary to support a finding that Zurich committed civil fraud.  See Avery, 448 S.E.2d at 739.  Thus, for the same reasons that there are no issues of fact whether Zurich (or ISSI) had the necessary fraudulent intent to support Rosen's claims of fraud, there is no issue of fact whether—and certainly no reasonable juror could believe based on the facts in this case that—Zurich (or ISSI) had the requisite criminal intent necessary for theft by taking, theft by deception, mail fraud, or wire fraud.  In the absence of an issue of fact on this required element of the alleged predicate crimes that Rosen claims caused him injury, Rosen does not have standing to bring this claim.  Summary judgment is required to be granted in Zurich's favor on Rosen's RICO Act claim.  For the same reasons, it is

---

[16] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981.

unnecessary to consider Rosen's motion for partial summary judgment on his claim that there is a pattern of racketeering activity.  Rosen's motion for partial summary judgment must be denied.[17]

### G.    Conspiracy To Violate Georgia RICO Act

Zurich has moved for summary judgment on Rosen's claim that Zurich and ISSI entered into a conspiracy to violate Georgia's RICO Act.  It is unlawful to conspire to violate the substantive provisions of Georgia's RICO Act.  Ga. Code Ann. § 16-14-4(c).  Defendants may be found liable for violating § 16-14-4(c) if they knowingly and willfully join a conspiracy which itself contains a common plan or purpose to commit two or more predicate acts.  S. Intermodal Logistics, Inc. v. D.J. Powers Co., 10 F. Supp. 2d 1337, 1360-61 (S.D. Ga. 1998).  Thus, if Rosen shows that Zurich joined or formed a conspiracy to violate the Georgia RICO Act, Zurich may be found liable for injuries to Rosen caused by co-conspirators in furtherance of the conspiracy.  See id. at 1361 ("it does not matter if the defendant himself committed any predicate acts, so long as he knowingly and willfully joins a conspiratorial scheme which contemplates that a co-conspirator will do so"); Pasha v. State, 616 S.E.2d 135, 138 (Ga. Ct. App. 2005) (noting that in a conspiracy, conspirators are liable for actions undertaken by co-conspirators).

---

[17] The Court also denies as moot Zurich's Motion for Leave to File a Surreply and Amended Motion for Leave to File a Surreply.

In support of its motion for summary judgment, Zurich argues there is not any evidence that Zurich knowingly entered into an agreement with ISSI or Protective Life Insurance to commit any of the predicate RICO acts that Rosen claims support his RICO claim.  (Defs.' Mot. Summ. J. 30-31).  Rosen's claim relies entirely on the instruction Zurich gave to ISSI to comply with certain regulatory requirements spelled out in a letter from the New York State Insurance Department.  (Pl.'s Resp. Mot. Summ. J. 31 & Ex. D).  As an administrator of the Protective E&O Program, ISSI was required to form an Insurance Purchasing Group that would negotiate insurance on behalf of the group.  Rosen argues that the Purchasing Group ISSI created "was never a legitimate purchasing group" and that a "reasonable jury could conclude that Zurich entered into a conspiracy with ISSI to form [the Purchasing Group] and deceive regulators into permitting the [Protective E&O Program] to continue, so that they could continue to defraud and steal from Protective agents."  (Id.).

Rosen also says that he and "the other participants in the [Protective E&O Insurance] Program . . . were never informed that they were or were not members of [the Purchasing Group]."  (Id. at 4).  Rosen argues that ISSI did not communicate with Rosen about whether Rosen was a member of the Purchasing Group, and Rosen apparently did not receive any communication respecting the

51

existence or activities of the Purchasing Group.  (Id. at 6-7).  While Rosen points

to allegedly false statements made to state insurance regulators and alleged

regulatory improprieties, to support the formation of an alleged conspiracy, he has

not shown that any acts in furtherance of this alleged conspiracy injured him in any

cognizable manner.  To avoid summary judgment, Rosen must offer facts showing

some act in furtherance of the conspiracy that caused him harm.  Rosen has not

done so and summary judgment is required to be granted in Zurich's favor on

Rosen's claim of a civil conspiracy to violate Georgia's RICO Act.

      H.     <u>Punitive Damages And Attorneys' Fees</u>

      Zurich moves for summary judgment on Rosen's claims for punitive

damages.  Punitive damages are not available for breach of contract claims.  Ga.

Code Ann. § 13-6-10; <u>Paul Dean Corp. v. Kilgore</u>, 556 S.E.2d 228, 234 (Ga. Ct.

App. 2001) ("It is axiomatic that punitive damages are not recoverable for breach

of contract, even if the breaching party acted in bad faith . . . .  If, however, there is

evidence of fraud, punitive damages can be awarded, as fraud constitutes tortious

conduct.").  The exclusion of punitive damages for breach of contract claims

applies even where the contract is a settlement agreement.  <u>Id.</u> (finding that the

"breach of the settlement agreement . . . [was] an insufficient basis to sustain an

award of punitive damages").

Rosen's only remaining substantive claim is that Zurich breached the Settlement Agreement when Zurich included in the May 2008 Loss Run the settlement amount term from the Settlement Agreement.  The Court has granted summary judgment against Rosen on his claim that Zurich's dissemination of the May 2008 Loss Run was fraudulent.  Because Rosen's breach of contract claim cannot as a matter of law support an award of punitive damages, the Court is required to grant summary judgment in Zurich's favor on Rosen's punitive damages claim.

Zurich also moves for summary judgment on Rosen's claim for attorneys' fees.  Georgia law authorizes an award of attorneys' fees "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense."  Ga. Code Ann. § 13-6-11.  "In contract actions 'bad faith referred to in the code is not bad faith in refusing to pay but bad faith in the transaction out of which the cause of action arises.'"  Trickett v. Advanced Neuromodulation Sys., Inc., 542 F. Supp. 2d 1338, 1355 (S.D. Ga. 2008) (quoting Jordan Bridge Co. v. I.S. Bailey, Jr., Inc., 296 S.E.2d 107, 109 (Ga. Ct. App. 1982)).  This requires a showing "that the contract was made in bad faith or that the defendant breached the contract as a result of 'some interested or sinister motive.'"  APAC-Southeast, Inc. v. Coastal Caisson Corp., 514 F. Supp. 2d 1373,

1382 (N.D. Ga. 2007) (quoting <u>Glen Rest., Inc. v. West</u>, 325 S.E.2d 781, 782 (Ga. Ct. App. 1984)).

On a motion for summary judgment, the movant bears the initial burden of demonstrating the absence of a genuine dispute as to any material fact.  Zurich has not argued that the evidence is insufficient as a matter of law to support Rosen's claim for attorneys' fees, only that Zurich is entitled to summary judgment on the attorneys' fees claim because it is entitled to summary judgment on each of Rosen's substantive claims.  This argument fails because Zurich is not entitled to summary judgment on Rosen's claim that Zurich breached the Settlement Agreement in May 2008.  Although some evidence suggests Zurich's purported breach of the Settlement Agreement resulted from an inadvertent coding error rather than a self-interested or sinister motive, (Koller II Dep. 89:13-:23), Zurich has not demonstrated the absence of a disputed material fact on Rosen's attorneys' fees claim. Rosen therefore has no corresponding burden to demonstrate specific facts supporting his claim for attorneys' fees.  Zurich's request for summary judgment on Rosen's claim for attorneys' fees is required to be denied.[18]

---

[18] The briefing on Zurich's Motion for Summary Judgment was sufficient to allow the Court to render a decision on the merits and Zurich's Motion for Oral Hearing is denied as moot.

### III.   PLAINTIFF'S MOTIONS TO EXCLUDE TESTIMONY

Rosen moves to exclude two of Zurich's expert witnesses: Stephen B. Darr ("Darr") and Marshall W. Reavis, III, Ph.D. ("Dr. Reavis").  Under Federal Rule of Evidence 702, if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  The proponent of the expert testimony "must show that: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993) & City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 665 (11th Cir. 1998)).

A.   Motion To Exclude Testimony Of Darr

Zurich retained Darr as a rebuttal witness to Rosen's expert on the issue of damages.  In his Expert Report [147-1], Darr assesses and comments on Rosen's expert's opinion about the diminution in value of Rosen's business as of March 18,

2008, which resulted from Zurich's refusal to provide Rosen with E&O Insurance coverage.  (Darr Expert Report at 2).  As a matter of law, however, the Settlement Agreement did not prohibit Zurich from using the existence or facts of the Griffin Action or Bad Faith Action as a basis for denying coverage to Rosen.  Rosen's only claim that is sufficient to survive summary judgment is the alleged breach of contract by Zurich in May 2008.  This breach occurred after the time period relevant to Darr's Expert Report, so the proposed testimony would not assist the jury to understand the evidence or to determine a fact in issue.  Because Darr's testimony is no longer relevant, Rosen's Motion to Exclude the Testimony of Stephen B. Darr is denied as moot.

> B.    <u>Motion To Exclude Testimony Of Dr. Reavis</u>

Rosen also seeks to exclude the expert testimony and expert rebuttal testimony of Dr. Reavis.  The scope of Dr. Reavis's expert rebuttal testimony is described by his Expert Rebuttal Report [146-1].  The Court notes that the rebuttal testimony relates to ISSI's conduct as administrator of the Protective E&O Insurance Program and other claims that are no longer pending in this matter.  There is nothing in the Rebuttal Report that would assist the jury to understand the evidence or to determine a fact in issue for the remaining claims in this action.  Because it appears that Zurich will no longer seek to offer the proposed rebuttal

testimony by Dr. Reavis, Rosen's motion to exclude Dr. Reavis's rebuttal testimony is denied as moot.

The scope of Dr. Reavis's direct expert testimony is described by his Expert Report [139-1].  Most of the report relates to claims that are no longer pending in this lawsuit.  One opinion, however, requires further discussion.  Dr. Reavis opines that the "[t]ransmittal of the [May 2008] Loss Run to ISSI and Protective Life was appropriate because of the confidentiality clause in the Producer Agreement with ISSI and because Protective is an insured and entitled to know the loss history.  Further, Rosen specifically requested the Loss Run be transmitted to others." (Reavis Expert Report 3).  Dr. Reavis states further that loss runs "are generally available within an insurance company for its use and made available to the producer and sponsoring company."  (Id. at 4).  Dr. Reavis concludes that, "[b]ased on [his] review of the documents provided to [him,] no one directly connected with the Settlement Agreement did violate the terms of the agreement as Rosen alleges." (Id.).

This proposed testimony consists solely of Dr. Reavis's legal conclusion. "An expert may not, however, merely tell the jury what result to reach.  A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law."  Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537,

1541 (11th Cir. 1990) (internal citation omitted).  Once the Court declares the

meaning of the unambiguous terms of the Settlement Agreement as a matter of

law, the jury must decide what conduct occurred and whether the conduct breached

Zurich's obligations of the Settlement Agreement.  The proposed testimony seeks

to displace the role of the Court by offering Dr. Reavis's opinion on the scope of

the obligations described by the unambiguous language of the Settlement

Agreement, which is not allowable under the Rules of Evidence.  Dr. Reavis's

proposed testimony would not assist the jury in its decision-making process, other

than by impermissibly making the conclusory declaration that "no one directly

connected with the Settlement Agreement did violate the terms of the agreement as

Rosen alleges."  (Dr. Reavis Report at 4); see Montgomery, 898 F.2d at 1541 (an

expert may not "merely tell the jury what result to reach").  To the extent Dr.

Reavis's Expert Report indicates that he would testify to matters that are still

relevant to this case, Rosen's motion to exclude must be granted.

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants American Guarantee and

Liability Insurance Company and Zurich American Insurance Company's Motion

for Summary Judgment [172] is **GRANTED IN PART** and **DENIED IN PART**.

Summary judgment is **GRANTED** in Defendants' favor on the fraud claims, Georgia RICO Act claim, Georgia RICO Act conspiracy claim, and punitive damages claim.  Summary judgment is further **GRANTED** in Defendants' favor on the breach of contract claims relating to Plaintiff's termination from Protective Life Insurance and Defendants' refusal to cover Plaintiff under the Old Mutual E&O Program.  Summary judgment is **DENIED** on the breach of contract claim arising from the creation and dissemination of Plaintiff's loss run in May 2008, and the attorneys' fees claim.

**IT IS FURTHER ORDERED** that Plaintiff Jonathan Rosen's Motion for Partial Summary Judgment [176] is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Defendants' Motion for Leave to File a Surreply Brief [214] and Amended Motion for Leave to File a Surreply [215] are **DENIED** as moot.

**IT IS FURTHER ORDERED** that Plaintiff Jonathan Rosen's Motion to Exclude Testimony of Stephen B. Darr [169] is **DENIED** as moot.

**IT IS FURTHER ORDERED** that Plaintiff Jonathan Rosen's Motion to Exclude Testimony of Marshall W. Reavis, III, Ph.D. [170] is **GRANTED IN PART** and **DENIED IN PART** as moot.  Dr. Reavis's proposed testimony about

Defendants' legal obligations under the Settlement Agreement and whether

Defendants breached those obligations is excluded.

**IT IS FURTHER ORDERED** that Defendants' Motion for Oral Hearing

[175] is **DENIED**.


**SO ORDERED** this 23rd day of September, 2011.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE